# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

| | | |
|---|---|---|
| WENDY CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 1:05-1018-T-An |
| | ) | |
| PORTER CABLE/DELTA, | ) | |
| | ) | |
| Defendant. | ) | |

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Wendy Craig ("Craig") filed this wrongful discharge lawsuit against Defendant Porter Cable/Delta Corporation ("Porter Cable"), her former employer, pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et. seq.*, the Americans With Disabilities Act of 1990, ("ADA"), 42 U.S.C. §§ 12101, *et. seq.*, and Tennessee law. Porter Cable moves for summary judgment on each of these three claims. It argues that Craig cannot prevail under the FMLA because: (a) Craig did not exercise any FMLA-protected rights at any relevant time that could have motivated Porter Cable's decision to terminate her, and (b) even if Craig did exercise FMLA-protected rights, Porter Cable articulated legitimate reasons for firing Craig, and Craig did not come forward with evidence tending to rebut Porter Cable's stated reasons. With respect to the ADA claim, Porter Cable contends that Craig has failed to present evidence that Porter Cable "regarded"

Craig as having an impairment that substantially limited her in the major life activity of working.  Third, Porter Cable seeks summary judgment on Craig's Tennessee law claim of retaliatory discharge—which Craig argues was motivated substantially by her assertion of a workers' compensation "claim"—because Craig presented no evidence that she ever made such a claim and, even if she did make a claim, she offered no evidence tending to prove that the claim was a substantial factor motivating the decision to fire her.

For the reasons explained below, Porter Cable's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  Porter Cable is entitled to summary judgment on Craig's ADA and Tennessee law claims.  Craig's FMLA claims cannot be summarily disposed of, however, because a genuine issue of material fact exists as to whether her exercise of FMLA-protected rights was a motivating factor in the decision to terminate her employment.

## I.  Factual and Procedural Background

In March of 1997 Wendy Craig began working as an hourly-wage employee on the Final Assembly Line in Porter Cable's Jackson, Tennessee power-tool manufacturing and distribution plant.  By January of 2004, Craig's supervisors expected her to work as an assembly line "floater."  This job required Craig to be willing and able quickly to transfer from one of the many different specific areas of the main assembly line to another area whenever there was an opening in one area of the line that needed to be filled.  Craig was assigned to this duty because she had been trained in most areas of the assembly line and thus had a wide range of relevant skills.  In this position Craig floated as needed among the tiger

2

saw, the tiger claw, the 690 router, the 360 belt-sander, the 340 sander, the profile sander, the fields, the paint, the armature, and the rework lines.

Also in January of 2004, Craig began to experience inflammation in her shoulder. The pain in her shoulder was traceable to an injury that she had sustained in a car accident eleven years earlier. She left work to visit an orthopedic surgeon, Dr. Stonecipher, on January 22, 2004. Dr. Stonecipher prescribed steroids for Craig's shoulder inflammation and instructed her to remain off work for one week. (Dep. of Wendy Craig at 37–38.) At her next appointment, on January 29, Dr. Stonecipher extended the work restriction for a few additional days and prescribed Craig a different medication. *Id.* at 39. Dr. Stonecipher returned her to work without restriction a few days later. *Id.* at 37.

Before Craig's appointment with Dr. Stonecipher, Porter Cable nurse Jennifer Hill ("Hill") personally handed Craig a Certification of Serious Health Condition form and instructed Craig to have Dr. Stonecipher complete and return the form to the company. *See* Porter Cable's Statement of Facts ¶ 8; Craig's Resp. to Porter Cable's Statement of Facts ¶¶ 5–13; (Dep. of Craig at 40–41.) The company's FMLA employee handbook explained the certification policy as follows:

> An eligible employee may receive FMLA leave for [a serious health condition.]
>
> . . .
>
> The company will require the employee to complete a Leave of Absence & FMLA Application Form and provide a Certification of Health Care Provider Form to verify a serious health condition. A delay or denial in granting the leave may occur if the certification form is not provided in a timely manner.

(Dep. of Craig, Ex. 7.)  Craig provided the form to someone at Dr. Stonecipher's office, who completed the form and timely faxed it back to nurse Hill.  *Id.* at 40.  It is undisputed that these leaves beginning in January 2004 were FMLA-qualifying leaves.

In April of 2004, Craig informed her immediate supervisor, Carolyn Walker ("Walker"), that she was having back pain.  *Id.* at 50.  Walker told Craig to see nurse Hill, who then told Craig to go to a doctor at a walk-in clinic.  *Id.* at 50–51.  Craig went to the walk-in clinic as soon as her shift ended that day.  *Id.* at 51.  The doctor prescribed a course of medication and instructed Craig not to work from April 26 until May 3.  (Craig Aff. ¶ 3.)  The doctor also wrote a note, dated April 26, advising that Craig would miss a week of work due to "lumbar strain."  *Id.*; (*see also* Dep. of Craig, Ex. 4.)  Although Hill suggests that Craig did not personally deliver this note, it is undisputed that Hill received and read the April 26 note.  (Hill Aff. ¶ 7.)

Nurse Hill claims that, after receiving the doctor's note, she "mailed the FMLA Certification of Serious Health Care form to be completed by the health care provider because [Craig] did not bring the note in [herself] and talk to me [about the illness and the] FMLA paperwork."  *Id.*  She also says that Craig was placed on provisional FMLA leave pending the return of the certification.  *Id.*  Craig, on the other hand, alleges that she spoke personally with Hill about her need for leave from April 26 until May 3 and that Hill "never mentioned that I needed to provide a specific medical certification form beyond my

physician's note." (Craig Aff. ¶ 3.) Craig denies ever seeing this form. *Id.*[1]

Craig returned to work in early May with no restrictions. (Dep. of Craig at 51.) However, she allegedly asked supervisor Walker to move her from the 360 belt-sander because Craig did not want to "injure [her] back again" after she had already missed a week of work. *Id.* at 49. Walker explained to Craig that Walker did not have anywhere else to assign Craig and that Craig was needed on the 360 belt-sander at that time. *Id.* at 52.

Craig worked on the 360 belt-sander line for three days following this meeting. *Id.* Craig's back was still hurting after the third day, so she once again tried to speak with Walker. *Id.* Craig says that she eventually went to nurse Hill about this pain because Walker was not able to talk with her. *Id.* Nurse Hill gave Craig some Ibuprofen and again told Craig to go to a doctor, which Craig did at the end of the workday. *Id.* at 53. A doctor wrote Craig another note, dated May 5, stating that Craig was to remain off of work for another week due to a "lumbar spine sprain/strain." *Id.*; *see also id.*, Ex. 4.

Craig remembers returning the May 5 doctor's note to nurse Hill before she returned to work on May 13. *Id.* at 66. Hill does not deny receiving the May 5 doctor's note but claims that she followed up that receipt by mailing another certification-of-serious-health-condition form that was never returned to her. (Hill Aff. ¶ 8.) As she did with respect to the certification that allegedly was sent following the April 26–May 3 leave, Craig denies that

---

[1]Hill's affidavit contains an ambiguity regarding whether Hill claims to have mailed the form to Craig or to the walk-in clinic after reading the note. Hill merely declares that she followed customary practice, which she claims was to use the mail if an employee did not speak to her personally about the need for leave. (Hill Aff. ¶ 7.) However, Craig claims that she did personally deliver the doctor's note and that she did discuss her need for leave from April 26–May 3 with nurse Hill. (Craig Aff. ¶ 3.)

she ever received a certification from Hill regarding the May 5 note and asserts that Hill did not tell her she needed any verification of her medical condition in addition to the doctor's note itself.  (Craig Aff. ¶ 4.[2])

Craig went back to work, without restriction, on May 13.  On that same say, the plant's production manager, Donald Tucker ("Tucker"), had a meeting with Craig and typed up an "Interoffice Memo" concerning her.  (Dep. of Tucker, Ex. 1.).  The first sentence of the memo, in the "background" section, stated that:

> *Wendy has missed work on MLOA[3] three times during the 2004 year (1/23, 4/26, & 5/4) totaling 18 days. . . .*

*Id.* (emphasis added).  The background section continued:

> Wendy has a history of complaining about work stations in the Final Assembly area hurting her arm or her back.  Supervisor Carolyn Walker has utilized Wendy in several different work stations on several different lines over the past six months to accommodate Wendy as much as possible.  However, Wendy has not been happy with assignments on the 690 router line, the tiger saw line, the 340 sander line, or the 360 belt-sander line.

*Id.*  In the following description of his May 13 conversation with Craig, Tucker wrote:

> Wendy began to ask about her job security because of the number of medical leaves she had and was also inquiring as to where she would be placed (which assembly line) for work since returning from leave.  She stated that she did not have a problem with the particular station she was assigned to that day (690 router), but had problems with several of the stations on the 360 belt sander where she had started out that morning.

> Wendy went through the reasons she had taken MLOA for the past two most recent occasions . . . .  She then asked if her job was in jeopardy.

---

[2]Moreover, Porter Cable fired Craig before any return of such certification could have been deemed untimely under Porter Cable's certification policy.

[3]"MLOA" stood for "medical leave of absence."  (Dep. of Tucker at 13.)

It was explained to Wendy that the subjective evidence of her work record did not look good. *Three MLOA's during the first five months of the 2004 coupled with at least one per year for the previous two years posed the question of her possibly taking advantage of the system.* It was also explained that she had been placed on several different assembly lines (690 router, tiger saw, 340 sander, 360 belt sander) and had complained about each of those assignments. It was explained that it appeared as though she was manipulating the system to be placed in work areas she preferred . . . . It was also brought to her attention that one of her previous work areas had requested she not be sent back due to excessive talking and poor performance (rework area). It was explained that she had become unreliable to be at work to perform the needed jobs. It was stated that because of these facts, her performance at the current time for the 2004 year was below expectations.

Wendy was told that her job was in jeopardy and she needed to go to work in the area her supervisor assigned her to each day and perform a good job as well as be at work on a reliable basis.

*Id.* (emphasis added).

The very next day Walker, under the supervision of Tucker, completed a "Performance Review and Evaluation" about Craig. (Dep. of Walker at 22.) Walker and Tucker did not consult with Craig before filling out this form. *Id.* Under the section entitled "Communication Skills/Teamwork[,]" Walker wrote that, "Wendy is capable of being a team player, [but] much of her communication tends to be negative." *Id.*, Ex. 1. Under "Work Commitment," Walker noted that Craig had been absent 3.5 days in addition to the days she had been on medical leaves of absence during 2004. *Id.* at 25; *id.*, Ex. 1.[4] In the comments subsection under this same section, Walker wrote that Craig had a "past history of attendance issues," but she had "recently improved in this area." *Id.*, Ex. 1. Then, at Tucker's direction,

---

[4]Walker testified that, based solely on the number of Craig's non-medical absences in 2004, her annual performance score on Porter Cable's attendance policy at the time of her termination would have exceeded expectations. (Dep. of Walker at 36.) Due to a number of additional "occurrences," however, Tucker and Walker "bumped" her score down to a "meets" expectations score. *Id.* at 36.

Walker added the following comment:

> *However, she has been on medical leave of absence three times within the first 5 months of 2004*, and unavailable to perform her job.

*Id.* (emphasis added).  Although Tucker told Walker to add this statement, Walker "agreed" that Craig had become unreliable due to her time on medical leave.  *Id.* at 28.

Under the heading "Organizing and Accomplishing Work," Walker wrote that Craig was "capable . . . if she wants to be" but also that "it is very difficult to find work situations she is willing to operate in.  Attempts have been made to place her on several lines without success.  When loaned out to other [departments,] it is reported that she talks too much and does not accomplish her work. *Id.*, Ex. 1.  As to problem-solving, Walker stated that Craig's "communication on problems solving is always negative."  *Id.*  Next, under "Supervisor Comments," Walker noted:

> Wendy has the ability and knowledge to be a good operator in the assembly dept. However, it has become increasingly difficult to find a work station she is agreeable with.  *She has become unreliable to her team due to the amount of time on medical leave of absence.*

*Id.* (emphasis added).

Craig subsequently read and signed the May 14 evaluation.  Walker and Tucker also signed the evaluation, and they "joint[ly]" made the decision to fire Craig.  *Id.* at 39–40.  In his final comments, which purported to explain the decision that led to this lawsuit, Tucker wrote:

> Wendy has good capabilities, but unfortunately, has not been cooperative in working in the [final assembly] area.  It is difficult to find work that Wendy is agreeable to. It is my recommendation that she be terminated to seek other job opportunities.

*Id.*

Craig sued Porter Cable in this court on January 25, 2005, asserting three claims for relief.  First, she alleged that her April and May 2004 back problem was a work-related injury; that her alleged conversations of this alleged work-related injury with Hill, Walker, and Tucker[5] constituted a claim for workers' compensation benefits under Tennessee law; and that Porter Cable violated Tennessee law by firing her because she made this claim. (Compl. ¶ 7.)  Second, Craig accused Porter Cable of violating the ADA by acting on its mistaken belief that she had a disability that substantially limited her in her ability to work in a class or range of manufacturing jobs.  (Compl. ¶ 8); *see* Craig's Mem. Opp. Mot. Summ. J. at 20 (relying on a district court case from Connecticut for the argument that if an employer "regards" a frequent-user of medical leave as "unreliable," and acts on that perception, he risks liability under the ADA)).  Third, Craig averred that Porter Cable, through the acts of Tucker and Walker, violated the FMLA's anti-retaliation provision by viewing Craig's taking of three FMLA-qualifying leaves as negative factors influencing their joint decision to terminate her.  (Compl. ¶¶ 9–13; *see* Dep. of Walker, Ex. 1.)

## II. Analysis

Porter Cable seeks summary judgment on each one of Craig's three claims for relief. A summary judgment "shall be rendered . . . if the pleadings, depositions, answers to

---

[5]Craig declares in her affidavit that she specifically made nurse Hill, Walker, and Tucker aware that she believed her back pain was caused or aggravated by a specific machine at work.  (Craig Aff. ¶¶ 3–5.)  Porter Cable contends that Craig's declarations are false and contradicted by her deposition, but Craig's credibility is an issue for the finder of fact.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Material facts are facts of such legal significance that, depending on how they are perceived by the *finder of fact*, " 'might affect the outcome of the suit.'" *Williams v. Principi*, ___F.3d___, ___, slip. op. at 4 (6ᵗʰ Cir. Mar. 17, 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  At the summary judgment stage, an asserted dispute of material fact is "genuine" if the evidence is such that " 'a reasonable jury could return a verdict for the nonmoving party'" on the disputed issue of material fact.  *Id.* (quoting *Anderson*, 477 U.S. at 248).  The facts, and the inferences to be drawn from those facts, must be viewed in favor of the nonmoving party for the purpose of determining the existence of a genuine issue of fact for trial.  *Edgar v. JAC Products, Inc.*, ___F.3d___, ___, slip. op. at 4 (6ᵗʰ Cir. April 6, 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson*, 477 U.S. at 251–252).

Governed by this standard, the court will now consider whether any or all of Craig's claims should be disposed of on summary judgment.

## A. Retaliatory Discharge Suit for Making a Workers' Compensation Claim Under Tennessee Law

In *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441 (Tenn. 1984), the Supreme Court of

Tennessee addressed whether the courts of that state should recognize an exception to the employment-at-will doctrine when the cause of the discharge was the employee's exercise of rights protected by the Tennessee Workers' Compensation Law ("WCL"), TENN. CODE ANN. §§ 50-6-101, *et. seq.  See* 677 S.W.2d at 442.  The court answered that question in the affirmative, even though the General Assembly of Tennessee had not provided an explicit cause of action for retaliatory discharge in the WCL.  *Id.* at 444.  Acknowledging concerns that the question presented "was a matter best left to the legislature," *id.* (citations omitted), the court reasoned that its decision to infer a cause of action for retaliatory discharge was necessary to effectuate the clearly expressed public policy of the General Assembly in creating a comprehensive, certain, and expeditious legislative scheme to define the legal duties and the legal rights of employers and injured employees in most workplace-injury settings.  *Id.*  The state legislature explicitly had outlawed any "device" which operated "to relieve any employer . . . of any obligation created by" the WCL, *id.* at 444–445 (citing TENN. CODE ANN. § 50-6-114), and the state legislature explicitly had instructed courts to give the WCL an " 'equitable construction . . . , to the end that the objects and purposes of [the WCL] may be realized and obtained,'" *id.* at 445 (quoting TENN. CODE ANN. § 50-6-116); *see also id.* at 444 (noting that "[r]etaliatory discharges completely circumvent [the] legislative scheme" by operating to "reliev[e] the employer of its duty to compensate and the employee of his or her right to compensation").  Based on these clearly articulated state legislative policies, the State Supreme Court endorsed an implied state law cause of action for retaliatory discharge for making a workers' compensation claim.  *Id.* at 445.

A plaintiff seeking to make out a *prima facie* case under Tennessee law pursuant to the *Clanton* theory must show: (1) that the plaintiff was an employee of the defendant at the time of the injury; (2) that the plaintiff made a claim against the defendant for workers' compensation benefits; (3) that the defendant terminated the plaintiff's employment; and (4) that the claim for workers' compensation benefits was a substantial factor motivating the employer's decision to terminate the employee's employment. *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558–559 (Tenn. 1993); *see also Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 684 (Tenn. Ct. App. 1999). The plaintiff bears the burden of producing evidence supporting each element, including evidence of a casual link between the claim and the discharge, before the employer must respond with a legitimate, non-pretextual explanation for the discharge. *Anderson*, 857 S.W.2d at 558–559.

When the plaintiff has presented *prima facie* proof on each element and the employer has responded with a legitimate, non-pretextual reason for the discharge, the burden returns to the plaintiff to produce " 'specific admissible facts, which realistically challenge the defendant's stated reasons.'" *Speakman v. Ada Ferrell Garden Apts.*, No. M11999-00509-COA-R3-CV, 2000 Tenn. App. LEXIS 344, at *16–17 (Tenn. Ct. App. May 30, 2000) (unpublished) (quoting *Hubrig v. Lockheed Martin Energy Sys.*, 1998 Tenn. App. LEXIS 303, at *24 (Tenn. Ct. App. May 4, 1998) (unpublished), *perm. app. denied*, 1998 Tenn. LEXIS 553 (1998) and citing *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986); *Silpacharin v. Metro. Gov't*, 797 S.W.2d 625, 629 (Tenn. Ct. App. 1990)). *See also Robinson v. Nissan Motor Mfg. Corp., U.S.A.*, 2000 Tenn. App. LEXIS 190, at *16–18

(Tenn. Ct. App. March 29, 2000); *Crum v. Tyson Fresh Meats*, 390 F. Supp.2d 658, 671 (M.D. Tenn. 2005) (applying Tennessee's burden-shifting framework in a workers' compensation retaliation case).  If the employee presents no evidence that the defendant's stated reasons are pretextual, then summary judgment is appropriate.  *Speakman*, 2000 Tenn. App. LEXIS 344, at *16 (citing *Devore v. Deloitte & Touche*, 1998 Tenn. App. LEXIS 122, at *16–17 (Tenn. Ct. App. Feb. 20, 1998) (unpublished)).

Porter Cable contends that Craig's *prima facie* case has not been established in this case because Craig never made a claim for workers' compensation benefits and because Craig produced no evidence that, if Craig did make a claim, either Walker or Tucker were substantially motivated by the claim during the decision-making process that led to Craig's termination.  In response to Porter Cable's first contention, Craig says that a workers' compensation "claim" was made under Tennessee law when Craig allegedly reported to nurse Hill, supervisor Walker, and Production Manager Tucker that Craig thought her back injury was related to her activities at work.  *See* Craig's Mem. Opp. Mot. Summ. J. at 14–15; Craig's Resp. to Porter Cable's Statement of Facts ¶¶ 31–32; (Craig Aff. ¶¶ 4–5.)  In response to Porter Cable's second argument, Craig says that the fourth element of her *prima facie* case is supported by evidence of temporal proximity plus evidence that Porter Cable subsequently terminated one of Craig's co-employees who indisputably had filed a workers' compensation claim.  *See* Craig's Mem. Opp. Mot. Summ. J. at 15.

Craig has presented evidence that, in May of 2004, immediately before her termination, she told nurse Hill, supervisor Walker, and Production Manager Tucker that she

13

had injured her back while operating a specific machine at work.  (Craig Aff. ¶¶ 4–5.)

Evidence of these reports, coupled with Craig's contemporaneous seeking of medical

treatment for her back pain, raises a genuine issue of fact as to whether Craig ever sought the

protection of the Tennessee WCL.  *See, e.g., Jamie v. Am. Water Heater Co.*, No. E2005-

00907-COA-R3-CV, 2006 Tenn. App. LEXIS 46, at *2, *8 (Tenn. Ct. App. Jan. 24, 2006)

(unpublished) (finding that an employee met the "claim" element by complaining about and

then seeking medical treatment for a work-related injury).  Porter Cable makes numerous,

plausible arguments as to why Craig's declaration that she made these alleged oral reports

is incredible, *see* Porter Cable's Mem. Supp. Summ. J. at 12–13; Porter Cable's Reply at 2–3,

but this court may not resolve at the summary judgment stage the credibility contest between

Craig's recollection and the recollections of Hill, Walker, and Tucker on this factual issue.

*See Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

Nor is Porter Cable correct that, as a matter of Tennessee law, an employee actually

must file suit or complete a written workers' compensation "claim" form to perfect a

subsequent suit for retaliatory discharge.  Rather, determining whether a retaliatory discharge

plaintiff made a workers' compensation "claim" is an issue that must be decided on a case-

by-case basis in light of the remedial purposes of the tort.  *See, e.g., Elliot v. Blakeford at

Green Hills*, No. M2000-00365-COA-R3-CV, 2000 Tenn. App. LEXIS 806, at *10–11

(Tenn. Ct. App. Dec. 13, 2000) (discussing the flexible nature of the second element of the

*Clanton* cause of action).  In *Elliot*, the Court of Appeals of Tennessee reversed a directed

verdict that had been based in part on the ground that the plaintiff did not specifically

14

mention "workers' compensation" until after she was fired. *Id.* at *10. The state court of appeals reiterated that the court had never:

> define[d] the exact steps an employee must take in order to be deemed to have 'sought workers' compensation benefits' for purposes of a retaliatory discharge action. *This was not an oversight.* Keeping that requirement flexible protects the employee from an employer who might be tempted to evade the law by obstructive tactics or by discharging her before she can take any specific steps.

*Id.* at *9–10 (emphasis added). Porter Cable's literal understanding of "claim" in this context is thus inconsistent with the Tennessee courts' more functional understanding, and it is the latter understanding that governs this court's analysis.

Having found that Craig has created a genuine issue of material fact as to whether she made a "claim" for workers' compensation benefits, the court must consider Porter Cable's argument that Craig has failed to present a jury issue as to whether there is a substantial causal link between her "claim" for benefits and her termination. Craig relies on the following circumstantial evidence to attempt to create a genuine dispute fact regarding substantial motivation[6]: (1) the immediate temporal proximity between the alleged "claim" and the discharge, and (2) the allegedly "identical" treatment of one of Craig's co-employees five months after Craig was fired. Porter Cable argues that immediate temporal proximity is insufficient and that the "other act" evidence is inadmissible.[7]

---

[6]Craig does not purport to have *direct evidence* that Walker and Tucker were substantially motivated by the "claim."

[7]Porter Cable also argues that Walker and Tucker did not *know* Craig had made a claim and therefore could not have been "motivated" by the claim. However, this court already found that Craig has created a genuine issue of fact as to whether she made a "claim" that Walker and Craig *knew of*. *See supra* (discussing Craig's declaration that she told Hill, Walker, and Tucker that she had hurt her back on a specific machine, and that she sought medical treatment for the back injury). Therefore, the court will address only Porter Cable's other arguments regarding the motive issue.

Temporal proximity between the claim and the discharge, even if immediate, does not by itself raise an inference of retaliation under Tennessee law. *Conaster v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 448 (Tenn. 1995).  In other words, the fact that Craig was fired immediately after her alleged workers' compensation claim does not entitle her to a trial.  However, temporal proximity plus *other circumstantial evidence* of causation requires the employer to come forward with a legitimate, non-retaliatory basis for the discharge. *See Mason v. Seaton*, 942 S.W.2d 470, 473 (1997).

Porter Cable believes Craig's "other circumstantial evidence," *i.e.* the "subsequent acts" evidence, is inadmissible on a number of evidentiary grounds.  *See* Porter Cable's Mot. in Limine to Exclude Testimony (citing relevance, confusion of issues, unfair prejudice); Porter Cable's Mot. in Limine to Exclude Hearsay (arguing that parts of Craig's "subsequent acts" evidence constitute inadmissible hearsay).  If the court agrees that the evidence must be excluded, Porter Cable is automatically entitled to summary judgment on this claim because the only other circumstantial evidence of motive is immediate temporal proximity, which is not sufficient.  However, it is unnecessary to resolve the evidentiary question at this time because, even if the evidence is admitted, Craig has not presented any evidence showing Porter Cable's articulated legitimate reasons for firing her are pretextual.  *See Speakman v. Ada Ferrell Garden Apts.*, No. M1999-00509-COA-R3-CV, 2000 Tenn. App. LEXIS 344, at *16 (Tenn. Ct. App. May 30, 2000) (unpublished) ("The employee faces summary dismissal of his claims if he is unable to demonstrate that he could prove that the defendant's [articulated reason] for the discharge was pretextual.").

Craig's only substantive argument on this issue is that Porter Cable's reliance on its *attendance policy* to justify the decision to fire her is pretextual.  Craig's Mem. Opp. Summ. J. at 15–16.  In support, Craig offers evidence ostensibly showing that her non-compliance with the attendance policy was a mere technicality that Porter Cable exploited to cover up its true motives.  (*See* Dep. of Walker at 36 (Walker referring to the decision to "bump" points as an "arbitrary" exercise).)  Craig overlooks the fact that Porter Cable has articulated numerous other legitimate, non-retaliatory reasons for firing her.  *See* Porter Cable's Mem. Supp. Mot. Summ. J. at 13.  For example, Tucker mentioned the following legitimate, non-retaliatory reasons for firing Craig, other than Craig's non-compliance with the attendance policy:

> Carolyn Walker reported to me that she had been told by two other employees that Wendy Craig had stated that she did not want to work on the belt sander and that if she was again placed on the belt sander she would just go on another leave of absence.  I believed this evidenced a desire to take advantage of the system and to manipulate the way work was assigned so that Craig would just be assigned to jobs she liked and was agreeable to perform.

> I was aware that at least one team leader had requested that Craig not be returned to that work area because she talked too much.

> At the time of her termination I was aware that Craig had complained about her work assignments and had requested that she not be assigned to some jobs.  As an assembler with no restrictions it is necessary that Craig be willing to work on any job for which she has been trained and to which she is assigned.

> I was also aware that Craig's communications were negative and that she questioned why jobs were required to be completed in certain ways.

> In my view Craig was not willing to perform specific jobs that were assigned to her . . . . [S]he was not agreeable . . . .  It was my conclusion that Craig wanted to work where she wanted to work not where we had work for her.  I felt that Craig did not want to do the work.

(Tucker Aff. ¶¶ 4–8.)  Craig argues that Tucker's declarations, and his proposed testimony, are based on hearsay because Tucker relies on what other people had told him about Craig's performance (and, in some cases, he relies on what other people had told him about what other people had told them about Craig's performance).  The proposed testimony is not, however, hearsay because it is not offered to prove *the truth* of any of the declarations about Craig's work performance (nor is it offered to prove that it was true that someone *said* something negative about Craig's work performance to a speaker who then relayed that rumor to Tucker).  The *sole* purpose of the proposed testimony is to offer an explanation as to why Tucker believed Craig should be fired, and such testimony clearly would not violate the hearsay rule.  *See, e.g.*, FED. R. EVID. 801(c) (defining hearsay to include only those out-of-court statements that are offered for their *truth*); *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir. 1991) (explaining that statements offered to show their effect on the listener's state of mind are not hearsay).

Craig thus is left with no evidence whatsoever tending to raise an issue of fact as to whether these stated reasons for firing Craig, other than her noncompliance with the attendance policy, are pretextual grounds.  The immediate temporal proximity between the "claim" and the discharge is not sufficient evidence under the governing law.  The additional, "subsequent acts" evidence, moreover, does not make it any more or less likely that Tucker did or did not act upon a legitimate belief that *Craig* "took advantage of the system," "manipulated," "talked too much," "complained" about having to float, was "negative," "questioned" why certain jobs had to be performed in certain ways, and was not "agreeable"

18

to working where she was assigned.

To survive summary judgment on her Tennessee law claim, Craig was required to create a genuine issue of fact as to whether her "claim" for benefits ultimately was a *substantial factor* in the employer's motivation to fire her. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (1993). Porter Cable has articulated numerous other motivations for its actions, besides the attendance policy[8], and Craig has presented no evidence suggesting that Walker and Tucker did not act in substantial part on those other motivations when they fired Craig. There is no genuine issue of fact, then, as to whether Porter Cable was substantially motivated by Craig's "claim" for workers' compensation benefits. Accordingly, the court **GRANTS** Porter Cable's Motion for Summary Judgment on Craig's Tennessee law claim of retaliatory discharge.[9]

## B. Craig's ADA Claim That Porter Cable "Regarded" Craig as a *Disabled Person*

When Congress enacted the ADA, Congress was conscious not to overlook entrenched societal " 'myths, fears and stereotypes'" about disabilities and people with disabilities. *See, e.g., Sutton v. United Air Lines*, 527 U.S. 471, 490–491 (1999); 29 C.F.R. pt. 1630, App. § 1630.2(l)(3). Recognizing that an individual could be significantly "handicapped" by mistaken perceptions about the individual's abilities and limitations,

---

[8]Besides the fact that the co-employee in question worked in the same general area under Tucker and Walker and also was determined to have violated the company's attendance policy, Craig has not explained how the co-employee's circumstances were "identical" to Craig's. In any event, it is unnecessary at this stage to decide whether the subsequent act evidence is inadmissible because, for the reasons explained, its admission would not change the outcome of the state law retaliation claim.

[9]In addition, even Craig acknowledges one alternative motive for her discharge: the alleged FMLA leaves.

Congress did not restrict its definition of "disability" to cover only those individuals with actual, substantially limiting impairments, but it instead extended the protection to any individual who is "*regarded as* having . . . *an impairment*" that "substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A) & (C) (emphases added).[10]  An individual may meet this definition of disability in two scenarios:

> [In the first scenario,] a covered entity mistakenly believes that a person has a physical *impairment* that substantially limits one or more major life activities[.]  [In the second scenario,] a covered entity mistakenly believes that an actual, nonlimiting *impairment* substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual.

*Sutton*, 527 U.S. at 489 (emphases added); *see also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 479–480 (6th Cir. 2005), *reh'g and reh'g en banc denied*, 2005 U.S. App. LEXIS 7354 (6th Cir. April 15, 2005).  The facts of this case, viewed in Craig's favor, do not fit into either scenario because Craig has presented no evidence that anyone at Porter acted on a belief, much less an unsubstantiated belief, that Craig was a disabled person.

Craig stretches to make this medical leave case an ADA case by arguing that Porter Cable, through the misperceptions of Tucker and Walker, "regarded" Craig as *unreliable* in all of her job duties when in fact she was only *unable* to perform approximately ten percent of those duties because they were the duties that allegedly caused or aggravated her pain.  *See* Craig's Mem. Opp. Mot. Summ. J. at 19–20.  According to Craig, the "mistaken perception" that her past absences and her isolated complaints about a few specific tasks

---

[10]A person is also "disabled" under the ADA if the person has a "record of such an impairment," but that definition is not at issue in this case.  *See* 42 U.S.C. § 12102(2)(B).

made her "unreliable" as a worker was a misperception that violated the ADA when acted upon by Tucker and Walker. *Id.* at 19–20. This theory misunderstands purpose of the "regarded as" definition of disability and is without merit.

Craig relies on one unpublished district court case from the District of Connecticut in which the court denied summary judgment because there was evidence that the defendants mistakenly had "regarded [the plaintiff] as 'unreliable' due to his medical absences," when in fact the plaintiff could attend work regularly and perform white collar or sedentary tasks in spite of his impairment. *See id.* at 20 (citing *Young v. Bank of Boston*, No. 3:93CV1642(AVC), 1995 U.S. Dist. LEXIS 22075, at *22 (D. Conn. March 31, 1995)). The court in *Young* reasoned that if the defendants mistakenly had understood the plaintiff's actual impairment[11] "to foreclose his ability regularly to attend work," then the defendants' misperception would have "foreclose[d] [the plaintiff's] success in any position," *Young*, 1995 U.S. Dist. LEXIS 22075, at *22; as a result, the *misperception* about the plaintiff's *impairment* would have substantially limited the plaintiff in the major life activity of working, *id.* at *22. Accordingly, the court concluded there was a genuine issue of fact as to whether the defendants "regarded" the plaintiff as disabled.

*Young* is inapposite and does not support Craig's argument that Porter Cable regarded Craig as *disabled* by regarding her as "unreliable." In *Young*, the defendants mistakenly believed that an employee's *disability* was more serious than it was, and that mistake was

---

[11]The plaintiff in the cited case had " 'chest pain syndrome with normal coronary arteries and chronic artrial fibrillation.'"

borne out of the defendants' unsubstantiated assumption that the plaintiff's *disability* would cause more absences than it actually would have caused.  *Id.* at *22; *see also id.* at *13 n.7 (noting that one defendant simply assumed the plaintiff's disability had caused "irregular attendance" without any personal knowledge).  In contrast, Porter Cable allegedly regarded Craig as unreliable, not because of a mistaken belief about the *extent* of an actual or perceived *disability* of Craig's, *compare Young*, but because of Craig's *undisputed* use of medical leaves and her unwillingness to perform a few specific assigned tasks that she claimed caused her pain.  *See* Craig's Mem. Opp. Mot. Summ. J. at 19–20.  Even if Porter Cable was wrong to think that these *historical facts* (not assumptions) about Craig's attendance and behavior made her a completely unreliable worker, and thus was mistaken about Craig's *reliability*, the ADA's "regarded as" prong could not have been implicated by this alleged mistake because it was not borne out of any misperceptions or any stereotypes about *disabilities* generally or about Craig's *disability* in particular.  In other words, the alleged mistake was not the type of mistake regulated by the ADA.[12]

Because Craig has presented no evidence that any of Porter Cable's agents acted on an unsubstantiated stereotype regarding people with the disabilities of back and shoulder pain, including Craig, there is no genuine issue of *material* fact under the ADA's "regarded

_____

[12]None of the remaining cases cited by Craig even come close to providing support for her ADA claim.  For example, in *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469 (6th Cir. 2005), the employer *erroneously perceived* the employee's *alcoholism* to be a substantially limiting impairment and the employer was motivated by that misperception when it fired the employee.  398 F.3d at 485.  The mistake was based on the employer's factually- unsupported, stereotypical beliefs about the effects of the disease of alcoholism.  Here, the alleged mistake or legal violation is the degree of significance that Porter Cable attributed to certain *documented facts* about Craig's work performance, regardless of any actual or perceived disability.

as disabled" theory of liability in this case.   Therefore, the court **GRANTS** summary

judgment to Porter Cable on the ADA claim.

### C. Craig's Claim That Porter Cable Retaliated Against Her In Part Because She Had Taken FMLA-Qualifying Leaves of Absence

The FMLA entitles eligible employees to as many as twelve weeks of unpaid annual

leave made necessary "because of a serious health condition that makes the employee unable

to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  An

employer retaliates in violation of the FMLA, § 2615(a)(2), when the employer takes action

against the employee in part because of the employee's use of leave guaranteed by the

FMLA.  *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (noting that the

taking of medical leave under the FMLA may not be used as a negative factor in employment

actions) (citing 29 C.F.R. § 825.220(c)).  The precise elements of a successful *prima facie*

retaliation claim under the FMLA are (1) the exercise of a protected right, (2) an adverse

employment action, and (3) a causal connection between the exercise of the right and the

adverse action.  *Edgar v. JAC Prods.*, ___F.3d___, ___ , slip op. at 6 (6th Cir. April 6, 2006)

(citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).  But the

ultimate question these elements seek to answer is simply whether the plaintiff was the victim

of unlawful discrimination.  *See Gibson v. City of Louisville*, 336 F.3d 511, 514 (6th Cir.

2003).  Thus, the employee does not have to persuade the fact-finder that the taking of

FMLA-leave was the *sole* or substantial reason for the employer's action in order to establish

unlawful retaliation under the FMLA.  *See Gibson*, 336 F.3d 511, 513 (6th Cir. 2003); *id* at

514 (citing *Desert Palace v. Costa*, 123 S.Ct. 2148 (2003) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2003)).   Moreover, when the employee has produced *direct* evidence that the exercise of a protected right was negative factor motivating the employer's decision to take the adverse action, then it is unnecessary for the employee to proceed under the complex "*McDonnell Douglass*" burden-shifting method of determining discriminatory intent based on circumstantial evidence.   *C.f. DiCarlo v. Potter*, 358 F.3d 408, 415 (2004) (Title VII and Age Discrimination).

In this case, Craig has presented *direct evidence* raising a genuine issue of material fact as to whether Walker and Tucker took Craig's exercise of FMLA-leave into account as a negative factor when they jointly decided to terminate Craig's employment.  *See Dicarlo*, 358 F.3d at 416 (finding that remarks by person with decision-making authority to the terminate plaintiff were sufficiently direct to raise an inference of discriminatory intent); (Dep. of Walker at 39–40.)  Both Walker and Tucker made sufficiently specific remarks about Craig immediately before they terminated her.   Walker, after noting that Craig's attendance had improved, said, "*However, she has been on medical leave of absence three times within the first 5 months of 2004*."   Tucker's very first comment in his interoffice memo said, "*Wendy has missed work on [medical leave] three times during the 2004 year (1/23, 4/26, & 5/4) totaling 18 days*."   Based on the context in which these justifications were written[13]—*i.e.*, immediately before the termination the by those with the power to

_____

[13]The court notes that there is other direct evidence suggesting that leave was taken into account, but the quoted statements are sufficient to survive summary judgment.

24

terminate—a reasonable jury could conclude that Craig's exercise of FMLA-leave was at least *a* negative factor in Porter Cable's decision to terminate her.

It is undisputed that Craig exercised FMLA-leave in January and there is also no dispute over whether she suffered an adverse employment action in May when she was fired. Although Porter Cable has attempted to turn this case into a case about Craig's failure to "return"[14] two certification-of-serious-health-condition forms[15] within fifteen days after her alleged receipt of those forms sometime in May, s*ee also* 29 C.F.R. § 825.311(b) (employees must return such forms *within the time frame requested by* the employer), that is really a non-issue in this case because (1) Porter Cable's policy did not "request" return of the certification forms within *fifteen days* after receipt, but rather the policy required return in a *timely* manner,[16] (Dep. of Craig, Ex. 7); and (2) Porter Cable cannot now be heard to argue that Craig did not "*timely*" return a certification form when Porter Cable fired Craig at most *three weeks* after the first such form was allegedly sent.  This hypertechnical argument by Porter Cable is utterly unconvincing.

Craig has presented a genuine issue of material fact as to (1) whether she took FMLA-

---

[14]Craig denies receiving the form.

[15]Porter Cable has never framed the issue as the sufficiency of Craig's notice, but rather the company has always argued that Craig's claim fails simply because of the alleged technicality that she did not return a form within fifteen days.  This court expresses no opinion on whether Craig adequately gave notice to anyone other than nurse Hill that she was taking FMLA-leave, or on whether her notice to Hill was the equivalent of notice to the company; but the court *does* find that Craig's failure to return the certification form does not entitle Porter Cable to summary judgment on the issue of whether Craig exercised FMLA rights in this case.

[16]The regulations make fifteen days the *minimum* employers may allow for returning these forms, *see* 29 C.F.R. § 825.311(b), but there is no authority for Porter Cable's implicit argument that fifteen days is somehow a absolute default rule when an employer does not prescribe a specific time frame.

qualifying leaves of absence in April and May of 2004, and (2) whether Walker and Tucker held the taking of FMLA-leaves of absence against Craig when they made the joint decision to fire her.[17]   Therefore, the court **DENIES** Porter Cable's motion for summary judgment on the FMLA claim.

### III. Summary and Conclusion

Porter Cable's Motion for Summary Judgment (dkt. # 7) is **GRANTED IN PART** and **DENIED IN PART**.  A reasonable jury could return a verdict for Craig on her FMLA retaliation claim, so the court **DENIES** Porter Cable's motion for summary judgment with respect to the FMLA claim.  However, the court **GRANTS** summary judgment to Porter Cable on Craig's Tennessee law and ADA claims.

**IT IS SO ORDERED**.

 s/ **James D. Todd**                        
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

---

[17]Because Craig used direct evidence of discriminatory intent, it is unnecessary now to ask whether she raised an inference that Porter Cable's articulated reasons for firing her were "pretextual."

26